EDDIE BELMONTE, demandante y recurrente, *v.* AGUSTÍN MERCADO REVERÓN, ETC., demandados y recurridos.

*Número:* R-64-179      *Resuelto:* 14 de julio de 1967

*Cayetano Coll Pujols* y *Enrique González,* abogados del recurrente; *Germán Rieckehoff Sampayo,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

El recurrente Eddie Belmonte inició en 6 de julio de 1964 un pleito ante el Tribunal Superior, Sala de San Juan, que denominó "acción civil," en el cual se incluyen como únicos demandados a Agustín Mercado Reverón, en su capacidad de Administrador Hípico, y a los tres miembros que integran el jurado de las carreras de caballos que se celebran en el Hipódromo El Comandante. Después de narrar en veinte y siete párrafos una serie de hechos que culminaron con la imposición por el Administrador de un castigo de 10 días de suspensión como jinete,[1] el recurrente concluye

[1] Se expone que el peticionario Belmonte fue obstaculizado por otro jinete en una de las carreras celebradas el día 10 de mayo de 1964, por lo cual se formuló una reclamación de *foul* ante los señores del jurado, quienes la desatendieron y declararon "oficial" la llegada; que el peticionario llamó nuevamente a los jurados para consignar su protesta de

suplicando que "en protección de los derechos constitucionales de este demandante se sirva pasar sobre los siguientes extremos:

"(1) que vuestro demandante tiene derecho a asistencia legal en cualquier comparecencia para responder de cargos ante el Jurado Hípico, el Administrador Hípico o cualquier otra Autoridad Hípica.

(2) que los incisos 20 y 21 del Artículo 1001 del Reglamento Hípico en tanto y en cuanto, privan al demandante del derecho constitucional a la libertad de palabra, sujeto a las disposiciones del Código Penal de Puerto Rico, son nulos y anticonstitucionales.

(3) que ni el Jurado Hípico ni el Administrador Hípico, ni ninguna otra autoridad hípica tiene facultad para castigar a vuestro demandante sin haber cumplido con los requisitos mínimos de un debido proceso de ley; y

(4) que se dictamine específicamente que el castigo de 10 días de suspensión impuéstole a vuestro demandante por el Administrador Hípico en su Resolución de fecha 21 de mayo de 1964,

---

la decisión y la inacción ante su reclamación, respondiéndole el presidente del jurado que "quién era él para cuestionar las decisiones del jurado;" que al dirigirse a la caseta de los jinetes tuvo un altercado con el jinete que le había obstaculizado y como consecuencia de ello le fue impuesto un castigo de tres días de suspensión; que al terminar las carreras, mientras se disponía a retirarse a su hogar, fue abordado por un periodista a quien manifestó su propósito de trasladarse a Nueva York ya que le era imposible trabajar en Puerto Rico; que el periodista le conminó a deponer su actitud recordándole que era el líder en montas ganadoras, inquiriéndole "qué iba a hacer a su liderato," a lo cual respondió que "le regalaba el liderato a los señores del jurado para que hicieran con él lo que mejor les pareciera;" que en 13 de mayo se trasladó a Nueva York, y el día 16 siguiente recibió un cablegrama en el cual se le informaba que había sido suspendido indefinidamente y se requería su presencia ante el jurado; que regresó y el día 17, en compañía de su abogado, solicitó audiencia al jurado, lo cual le fue negado; que el día 19 se le citó para que compareciera a una vista ante el Administrador Hípico, que se celebró al día siguiente; que en dicha vista no se practicó prueba sobre los supuestos cargos; que se le notificó una resolución del Administrador imponiéndole un castigo de diez días contados desde el 13 de mayo, de forma que expiró el mismo día en que se le notificó; que recurrió ante la Junta Hípica alegando "se habían violentado sus derechos constitucionales," y en 3 de junio la Junta le notificó una resolución declarándose sin jurisdicción.

es nulo e inexistente en derecho y el mismo debe ser eliminado del expediente (récords) de este demandante en la Administración Hípica y asimismo que si dicho castigo ha sido notificado a cualquier agencia instrumentalidad y autoridad relacionada con el deporte hípico en el extranjero con la cual la Administración del Deporte Hípico de Puerto Rico mantenga relaciones se le notifique sobre la eliminación de dicho castigo."

■■■ Observamos, de entrada, que nada hay en la Ley Hípica de Puerto Rico, Núm. 149 de 22 de julio de 1960, 15 L.P.R.A. secs. 181 *et seq.*, que autorice la revisión directa por los tribunales de las actuaciones del Administrador y, mucho menos, de los miembros del jurado. El Art. 9, 15 L.P.R.A. sec. 189, dispone la revisión por medio de *certiorari* de las decisiones, órdenes y resoluciones finales de la Junta Hípica en cuanto a errores de derecho. Pero, como hemos visto, la Junta Hípica no es parte en este procedimiento. Ahora bien, aun cuando interpretáramos con excesiva liberalidad que el párrafo 23 de la demanda(2) se dirige a impugnar una actuación de este organismo, tampoco hubiese podido el tribunal a quo entender en el asunto ya que no se solicitó oportunamente la reconsideración de la resolución ni se presentó la petición de *certiorari* dentro del término que marca la ley.(3) A nuestro juicio lo expuesto es suficiente para demostrar que no se agotó cumplidamente el remedio administrativo disponible.

---

(2) "Que en fecha 3 de junio de 1964 la Junta Hípica notificó a este demandante una Resolución declarándose sin jurisdicción para entender en la apelación."

(3) Dispone en parte el Art. 9 que "Disponiéndose, que antes de la radicación de la petición de *certiorari* deberá solicitarse mediante moción al efecto la reconsideración de la decisión, orden o resolución, a la Junta Hípica." Ésta no es una mera formalidad si se tiene en cuenta que ante el Tribunal Superior el recurrente sólo podrá alegar, como errores de derecho en su recurso de revisión, aquellos que hubiere alegado en su moción de reconsideración a la Junta Hípica.

Dispone además que "La petición de *certiorari* . . . deberá presentarse dentro del término de quince (15) días de haberse notificado de la decisión, orden o resolución final. . . ."

■ Por otro lado, precisa aclarar que se trata aquí de la suspensión temporal de la licencia de jinete del recurrente por el período limitado de 10 días. (⁴) No estamos ante una cancelación o revocación de una licencia que requiera, indefectiblemente una previa audiencia y oportunidad de defensa. Ya en *Las Monjas Racing Corp.* v. *Com. Hípica,* 67 D.P.R. 45 (1947), interpretando un estatuto similar, (⁵) dijimos a las págs. 49 y 50:

■ ■ Como la concesión de una licencia es un privilegio y no constituye propiedad ni produce derechos contractuales entre el concesionario y el Gobierno, su revocación no priva de derecho alguno garantizado por la Constitución. *People* v. *Department of Health,* 82 N.E. 187 (N.Y. 1907). Consecuentemente, al conceder una licencia, la Legislatura puede imponer las condiciones que estime convenientes para suspenderla temporalmente o para revocarla. En efecto, la Ley Hípica Insular, al conferir a la Comisión Hípica facultades para conceder licencias, le reservó el poder de suspenderlas temporalmente y el de cancelarlas o revocarlas. En cuanto a la suspensión temporal, la autorizó para decretarla sin necesidad de previa audiencia y no concedió revisión judicial. En cambio, la autorización para cancelar o revocar licencias la condicionó a que previamente diese oportunidad al concesionario de ser oído en su defensa y concedió a éste el derecho a revisión judicial.

■ · · · · · · ·

La suspensión temporal, en distinción de la cancelación, la cual tiene carácter de permanente, debe ser por un período definido, el cual debe constar de la faz de la orden decretando la suspensión."

Cuando se trata de castigos impuestos por el jurado, fácil es advertir que se haría prácticamente imposible adminis-

---

(⁴) El acuerdo del jurado de fecha 17 de mayo de 1964 dispuso que el jinete "continúe suspendido," pero al referirse el asunto al Administrador "para que después de practicada la investigación correspondiente, tome las providencias que estime necesarias," dicho funcionario en 21 de mayo limitó la suspensión a 10 días, que vencían el día 23 siguiente.

(⁵) Sec. 7 de la anterior Ley Hípica, según enmendada por la Ley Núm. 17 de 15 de julio de 1935. (Leyes (2), pág. 97.)

trar la ley si se requiriera que los procedimientos ante dicho cuerpo que se relacionan generalmente con la conducta observada en el curso de las carreras estén indefectiblemente revestidos de las formalidades de audiencias, asistencia de abogado, contrainterrogatorio de testigos, etc.

El legislador dispuso taxativamente que el Administrador tenía facultad para suspender temporalmente o cancelar permanentemente las licencias de jinetes (Art. 7, 15 L.P.R.A. sec. 187), y que sólo en el caso de cancelación permanente debería dar a la persona perjudicada la oportunidad de ser oída en su defensa por sí o por medio de abogado. En el presente caso advertimos que el Administrador cautelosamente le concedió una vista al jinete Belmonte. [6]

■ Pero hay más. Dentro de la exposición confusa de las alegaciones parece tratar de impresionarnos con que en este caso está envuelta la libertad de expresión del peticionario, ya que en su origen fueron ciertas manifestaciones hechas por éste las que dieron lugar a que fuera citado por el jurado. No es así. Dice el acuerdo del jurado refiriendo el caso al Administrador: "En vista de que el jinete E. Belmonte a pesar de haber sido requerido por el Jurado para que compareciera ante dicho cuerpo a fin de investigar ciertas manifestaciones vertidas por dicho jinete a la prensa, a la radio y la televisión, *no ha comparecido;* y en vista además de que las supuestas manifestaciones, de ser ciertas que fueron vertidas por dicho jinete constituyen a juicio del Jurado una violación de los incisos 20 y 21 del Art. 1,001 del Reglamento Hípico . . . ;" y en la resolución del Administrador claramente se expone que "La acción del Jurado Hípico suspendiendo al jinete Belmonte surge porque habiendo éste requerido a Belmonte para que compareciera ante dicho cuerpo a fin de investigar alegadas manifesta-

_____

[6] Dice, en parte, la resolución del Administrador: "En dicho día y hora el querellado compareció acompañado del Lic. Cayetano Coll Pujols."

ciones vertidas por dicho jinete, que el Jurado entendía que de ser ciertas ello constituía una violación al reglamento hípico, dicho jinete no compareció ante el Jurado como era su obligación." Es por eso que al resolver, dicho funcionario expresa que "Más que las manifestaciones que antes hemos venido discutiendo, nos preocupa el reto de Belmonte al no comparecer ante el Jurado cuando fue requerido para ello. Creemos que no hubo justificación alguna para tal acto de abierta indisciplina."[7] Esto basta para disipar cualquier preocupación de que esté envuelta la conculcación de un derecho constitucional.[8]

■ Pero sea ello como fuere, otro escollo se levanta ante las pretensiones del recurrente. El Art. 8, 15 L.P.R.A. sec. 188, sólo autoriza la apelación ante la Junta Hípica de las suspensiones impuestas por el Administrador o el jurado cuando éstas fueren por un término de un mes o más. En este respecto actuó correctamente la Junta Hípica al declararse sin jurisdicción.[9]

■ Para finalizar deseamos llamar la atención de que al presentar la solicitud de revisión ante este Tribunal el peticionario acompañó copias de varios documentos—el acuerdo del Jurado de 19 de mayo incorporado a la citación a vista cursada por el Administrador, la resolución del Adminis-

---

[7] Ahora *tardíamente* se pretende aducir que el peticionario no atendió la citación del jurado porque se le impidió estar acompañado por su abogado. Tal parece que esta explicación no se presentó ante el Administrador, limitándose el abogado del jinete a explicar "el alcance de las frases vertidas."

[8] Somos los primeros en admitir que las frases atribuidas al recurrente en forma alguna son detrimentales al deporte y que constituyeron más bien la expresión de una reacción espontánea de éste ante actuaciones del jurado de las cuales disentía.

[9] Estamos apercibidos de que mediante sucesivas suspensiones por términos menores de un mes podría en efecto lograrse la suspensión indefinida de un jinete. Como esa situación no está ante nos, nos abstenemos de expresar criterio sobre el particular. Véase, sin embargo, *Hernández* v. *Comisión Hípica*, 50 D.P.R. 100 (1936).

trador, el escrito de apelación para ante la Junta Hípica y la resolución de ésta—que no tuvo ante sí el tribunal a quo. Esta práctica es indeseable y debe descontinuarse. Se coloca al tribunal de instancia en una señalada desventaja.

*Por todas las razones expuestas, se confirmará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en 31 de julio de 1964, por la cual se declaró con lugar la moción para desestimar presentada por la parte demandada.*

El Juez Presidente disintió en opinión separada. El Juez Asociado, Señor Belaval disintió mediante opinión en la cual concurren los Jueces Asociados Señores Hernández Matos y Santana Becerra.

—O—

Opinión disidente del Juez Presidente Señor Negrón Fernández

San Juan, Puerto Rico, a 14 de julio de 1967

Paso a exponer brevemente los fundamentos de mi disenso.

La demanda del jinete Eddie Belmonte en este caso—cuyas alegaciones de hecho debemos tomar como ciertas a los fines de la moción de desestimación de la parte demandada—fue desestimada mediante providencia titulada *Sentencia* que lee así:

"Examinada la demanda de la forma más favorable al demandante, vistas las disposiciones del Artículo 9 de la Ley Hípica de Puerto Rico, Ley Número 149 de 22 de julio de 1960, se declara con lugar la moción de desestimación toda vez que el demandante no ha agotado el remedio administrativo. Además, no habiendo el demandante recurrido ante este Tribunal mediante el recurso de certiorari que provee dicho Artículo 9, la adjudicación que hizo el jurado hípico o el Administrador Hípico en su caso, constituye cosa juzgada."

Sin embargo, la transcripción de las notas taquigráficas conteniendo la argumentación de las partes sobre la moción

de desestimación, indica que el tribunal a quo, en corte abierta, declaró con lugar dicha moción diciendo lo siguiente: "El Tribunal declara con lugar la moción de desestimación por cualquiera de los dos primeros fundamentos expuestos en la misma".

Los dos primeros fundamentos aducidos en la referida moción de desestimación fueron los siguientes:

"1. La demanda no expone una reclamación que justifique la concesión de un remedio." y
"2. Habiéndose cumplido el castigo impuesto al demandante la reclamación es académica."

Un tercer fundamento, al que no hizo referencia el tribunal al declarar con lugar la moción de desestimación en corte abierta fue: "El demandante no ha agotado el remedio administrativo."

Estimo errónea la resolución o sentencia del tribunal de instancia declarando con lugar la moción de desestimación por cualquier de los fundamentos expuestos, tanto en corte abierta como en su resolución o sentencia arriba transcrita. En igual forma considero errónea la decisión de este Tribunal al efecto de que "no se agotó cumplidamente el remedio administrativo disponible" refiriéndose a que Belmonte no solicitó oportunamente la reconsideración de la Junta Hípica declarándose sin jurisdicción para conocer de una apelación interpuesta por Belmonte del castigo de 10 días de suspensión impuéstole por el Administrado Hípico; y a que no acudiera al Tribunal Superior mediante petición de *certiorari* contra la resolución de la Junta Hípica dentro del término de 15 días de haberse notificado la referida resolución.

Belmonte no tenía derecho a apelar ante la Junta Hípica del castigo de 10 días de suspensión impuéstole por el Administrador Hípico, ya que esa apelación solamente la autoriza la Ley Hípica, Art. 8 (15 L.P.R.A. sec. 188), cuando las suspensiones fueren por un término de un mes o más. El propio Tribunal en su opinión acepta que la Junta Hípica

actuó correctamente al declararse sin jurisdicción por tal motivo. Por lo tanto Belmonte no tenía asequible el remedio administrativo de apelación para ante la Junta Hípica, ni tenía que agotar la exigencia del trámite administrativo de presentar moción de reconsideración alguna, ni tenía tampoco asequible el remedio de *certiorari* provisto por el Art. 9 de la Ley, 15 L.P.R.A. sec. 189, para revisar una resolución final de la Junta Hípica en cuanto a errores de derecho. No habiendo sido su castigo uno de suspensión de 30 días o más, la Junta Hípica no tenía autoridad o jurisdicción para concederle remedio alguno, y por consiguiente, Belmonte no tenía que agotar remedio administrativo alguno en busca de un remedio que no estaba a su disposición. Por lo tanto el fundamento de que Belmonte no agotó el remedio administrativo de pedir la reconsideración de la resolución de la Junta Hípica, o de que dejó de presentar la petición de *certiorari* ante el Tribunal Superior dentro del término que marca la ley, no son fundamentos válidos en derecho para desestimar su demanda.

Tampoco lo sería el de que la acción judicial de Belmonte era académica por haberse cumplido el castigo impuesto. De los hechos alegados en la demanda surge que la resolución del Administrador Hípico imponiéndole un castigo de 10 días contados desde el 13 de mayo de 1964 le fue notificada el mismo día en que vencía el castigo. No veo como pudiera invocarse contra Belmonte ese fundamento, cuando el supuesto cumplimiento del mismo no surge de un hecho voluntario del castigado, sino que surge como consecuencia de la propia acción del Administrador Hípico fijando la extensión del castigo hasta el propio día en que éste expiraba desde que se le hizo efectivo el 13 de mayo. (1) Belmonte no tenía

---

(1) Según los hechos alegados en la demanda fue durante las carreras celebradas el día *10 de mayo* de ese año que ocurrió el incidente original (véase escolio 1 de la opinión del Tribunal), en cuya fecha formalizó Belmonte una reclamación de *foul* ante los señores del jurado quienes la

remedio estatutario de revisión ni contra la resolución de la Junta Hípica ni contra la actuación del Administrador imponiéndole un castigo de 10 días de suspensión. Por lo tanto, no por vía de revisión estatutaria, sino por vía de impugnación a actuaciones que consideraba arbitrarias, procedía que el tribunal a quo conociera de la acción judicial interpuesta por Belmonte, pues, independientemente de la facultad conferida al Jurado o al Administrador Hípico para imponer suspensiones menores de un mes sin revisión estatutaria, la cuestión fundamental que surge de las alegaciones de su demanda gira alrededor de si las frases atribuidas a Belmonte respecto al jurado, en las carreras del 10 de mayo, constituían una violación a los incisos 20 y 21 del Art. 1001 del Reglamento Hípico, o sea, "Conducirse o dirigirse en forma grosera o soéz o faltarle el respeto a cualquier funcionario de la Administración.", inciso 20 y "Hacer manifestaciones falsas o detrimentales al deporte hípico así como a las personas relacionadas con el mismo.", inciso 21; o si las manifestaciones atribuidas a Belmonte no constituían tal violación, lo que admite este Tribunal en su opinión, escolio 8, al decir "somos los primeros en admitir que las frases atribuídas al recurrente en forma alguna son detrimentales al deporte y que constituyeron más bien la expresión de una reacción espontánea de éste ante actuaciones del jurado de las cuales disentía".

Fácil es advertir que si las manifestaciones atribuidas a Belmonte no constituían una violación a los incisos 20 y 21 ya citados, las mismas no podían dar margen a un cas-

---

desestimaron y declararon oficial la llegada, luego de lo cual, al dirigirse a la caseta de los jinetes, Belmonte tuvo un altercado con el jinete que, según él, lo había obstaculizado, como consecuencia de lo cual le fue impuesto a Belmonte un castigo de 3 días de suspensión.

He de suponer que Belmonte cumplió el castigo de 3 días de suspensión que le fuera impuesto por el altercado de referencia, y que por ello la suspensión subsiguiente de 10 días se la impuso el Administrador Hípico a partir del día 13 de mayo, esto es, luego de cumplida la primera suspensión de 3 días.

tigo, y que en tales condiciones, pudiendo estar envuelto en la investigación que se proponía hacer el jurado de tales manifestaciones (en fecha posterior al día 10 en que se celebraron las carreras) el derecho de libre expresión de Belmonte, no era inusitado que éste solicitara audiencia al jurado el día 17, asistido de su abogado (lo cual le fue negado), pues aparte de la importancia del derecho de Belmonte que podía resultar lesionado, no se trataba de una investigación del jurado en ,el momento mismo de estarse celebrando las carreras, que por su naturaleza y razones prácticas, debe ser breve, sino de una investigación no relacionada directamente con el desarrollo de las carreras en sí y que no habría de interrumpir el desarrollo de las mismas.

El riesgo de que se cierren las puertas de los tribunales al examen de actuaciones de funcionarios administrativos, que tienen su origen en conceptos del derecho de expresión que pueden estar equivocados, no queda salvado por el expediente de que a Belmonte se le castigó por *no comparecer* ante el jurado en la investigación que éste se proponía hacer de sus manifestaciones, y no por éstas. Debe examinarse, a mi juicio, si bajo las circunstancias de este caso hubo una incomparecencia injustificada de Belmonte ante el jurado y si el castigo impuéstole por el Administrador Hípico fue en realidad por un acto de "abierta indisciplina", o si se trata de una actuación razonable del jinete para la protección de sus derechos, que no justifiquen el castigo finalmente impuéstole por el Administrador. Ello sólo podría determinarse oyendo la prueba que ofreció producir Belmonte ante el tribunal a quo para sostener sus alegaciones. Sin prejuzgar una decisión en los méritos, estimo que Belmonte tiene derecho a su día en corte.

—O—

Opinión disidente del Juez Asociado Señor Belaval, con la cual están conformes los Jueces Asociados Señores Hernán-

dez Matos y Santana Becerra y concurre el Juez Presidente, Señor Luis Negrón Fernández

San Juan, Puerto Rico, a 14 de julio de 1967

En la solicitud de revisión que presenta el demandante recurrente, y que admiten como ciertos a los efectos de la discusión los demandados recurridos, se alegan los siguientes hechos:

"El recurrente es jinete con licencia número J 6430 expedida por las Autoridades Hípicas de Puerto Rico y en el transcurso de la segunda carrera de las celebradas el *10 de mayo de 1964* fue obstaculizado por el jinete R. Rivera y con tal motivo el recurrente se comunicó con los señores miembros del Jurado Hípico formulando una reclamación de 'foul' cuya reclamación no fue atendida por éstos; que viendo el recurrente que aún estando en la caseta del teléfono se había proclamado oficial el resultado de la carrera volvió a llamar a los señores del Jurado para inquirir porque no se consideraba su reclamación contestándole el Lic. Francisco Arrillaga, Presidente del Jurado Hípico, 'que quien era él para cuestionar las decisiones del Jurado' colgando el teléfono; que aturdido y sumamente molesto por el trato recibido, el recurrente al entrar a la caseta de los jinetes y al encontrarse con su compañero R. Rivera tuvo con éste un altercado como consecuencia del cual fue castigado por el Jurado Hípico a *tres días de suspensión*. Terminadas las carreras del domingo 10 de mayo de 1964 mientras el recurrente se retiraba a su hogar fue entrevistado por un periodista a quien le hizo ciertas manifestaciones entre 'que se sentía abrumado, perseguido y oprimido y pensaba trasladarse a la ciudad de Nueva York para continuar allí ejerciendo su profesión de jinete ya que aquí se le hacía imposible' y al indicarle el periodista que reconsiderara su actitud ya que el recurrente había sido el jinete con más triunfos en el año 1963 y que durante el año 1964 iba en la delantera con 16 o 17 victorias y que qué iba a hacer con el liderato de los jinetes el recurrente contestó 'que le regalaba dicho liderato a los señores del Jurado para que hicieran con él lo que mejor les pareciera', que el miércoles día 13 de mayo de 1964, según la resolución que había tomado el recurrente, después de su experiencia del domingo 10 de mayo de 1964, se trasladó a la ciudad

de Nueva York para de ejercer allí su profesión de jinete; que el miércoles 13 de mayo y a la hora de su partida para Nueva York, el recurrente no había sido citado por el Jurado Hípico, no había sido notificado de cargo alguno contra él ni tenía conocimiento de la existencia de ·cargo alguno contra él, ni de suspensión alguna que le hubiera sido impuesta a no ser la suspensión de tres (3) días impuéstale el domingo 10 de mayo de 1964 por el altercado con su compañero jinete R. Rivera, en la caseta de los jinetes y cuya suspensión expiraba el *miércoles 13 de mayo de 1964*; que el sábado 16 de mayo de 1964 y estando en la ciudad de Nueva York, el recurrente recibió una comunicación de su abogado, informándole que había sido castigado a una suspensión indefinida por parte del Jurado Hípico, que era necesario regresara para comparecer ante dicho Jurado; que respondiendo a la comunicación recibida de su abogado, el domingo 17 de mayo de 1964, el recurrente regresó a Puerto Rico, personándose al Hipódromo El Comandante acompañado de su abogado y solicitó audiencia de los señores del Jurado; que el Jurado Hípico se negó a recibir al recurrente *acompañado de su abogado* y el recurrente no subió a presencia de los señores del Jurado por consejo de su abogado; que el domingo 17 de mayo de 1964, o sea el mismo día que habiendo regresado de Nueva York, el recurrente trató de que el Jurado Hípico lo recibiera *acompañado de su abogado* y que el Jurado Hípico se negó a permitir la comparecencia del recurrente *acompañado de abogado;* dicho organismo tomó el siguiente acuerdo:

'*Jinete E. Belmonte—Suspendido y su caso referido al Administrador Hípico*—En vista de que el jinete E. Belmonte a pesar de haber sido requerido por el Jurado para que comparezca ante dicho cuerpo a fin de investigar ciertas manifestaciones vertidas por dicho jinete a la prensa, a la radio y la televisión, no ha comparecido; y en vista además, de que las supuestas manifestaciones, de ser ciertas que fueron vertidas por dicho jinete constituyen a juicio del Jurado una violación de los incisos 20 y 21· del Artículo 1,001 del Reglamento Hípico, *SE DETERMINA QUE EL JINETE E. BELMONTE CONTINUE SUSPENDIDO* y su caso sea referido al Administrador del Deporte Hípico para que después de practicada la investigación correspondiente, tome las providencias que estime necesarias a este caso.' (Énfasis y mayúsculas nuestras);

[que] ·el martes 19 de mayo de 1964, el Administrador Hípico Agustín Mercado Reverón, por carta en la cual copiaba el acuerdo adoptado por el Jurado Hípico el 17 de mayo de 1964, citó al recurrente para una investigación el miércoles 20 de mayo de 1964, a las nueve de la mañana. (Carta de 19 de mayo de 1964 de Agustín Mercado Reverón a Eddie Belmonte, Exh. 1) ; que cumpliendo con la citación héchale por el Administrador Hípico, de un día para otro o sea el 19 de mayo para el 20 de mayo, el recurrente compareció ante dicho funcionario acompañado de su abogado; que en la oficina del Administrador Hípico, este funcionario no notificó al recurrente con pliego de cargos alguno por violación a la Ley o reglamento Hípico que le hubiera sido formulado por el Jurado Hípico ni ofreció prueba alguna sobre violación alguna del recurrente a la Ley Hípica y/o sus Reglamentos; que el Administrador Hípico actuó así a pesar de que en su citación al recurrente para investigación le notificó que 'las supuestas manifestaciones de ser ciertas constituyen a juicio del Jurado violación de los Incisos 20 y 21 del Artículo 1001 del Reglamento Hípico;' que el jueves 21 de mayo de 1964, el Administrador Hípico dictó una resolución imponiéndole un castigo al recurrente de diez (10) días de suspensión a partir del día 13 de mayo de 1964 *'FECHA EN QUE FUERA SUSPENDIDO POR EL JURADO'*. (Mayúsculas y énfasis nuestro) (Resolución de 21 de mayo de 1964 Exh. 2) ; que la suspensión impuéstale al recurrente por el Administrador por su resolución de 21 de mayo de 1964, lo fue 'a partir del 13 de mayo de 1964' y le fue notificada al recurrente el día 22 de mayo de 1964, o sea, el mismo día en que quedaba extinguido el castigo. (Véase hecho 27 de la demanda, Exh. 5); que del acuerdo del Jurado Hípico de 17 de mayo de 1964, (Exh. 1 de esta Solicitud de Revisión) donde se expresa: ' *se determina que el jinete Eddie Belmonte continúe suspendido* y de la resolución del Administrador Hípico de 21 de mayo de 1964, donde se expresa *'el Administrador impone por la presente una suspensión al jinete Eddie Belmonte de diez días a partir del 13 de mayo de 1964, fecha en que fuera suspendido por el Jurado'*, surge claramente el hecho de que el recurrente fue castigado a suspensión indefinida por el Jurado Hípico el 13 de mayo de 1964, sin previa formulación de cargos, ni vista ni oportunidad de· ser oído. (Véase Exhibits 1 y 2) ; que de la resolución del 21 de mayo de 1964, el recurrente apeló para ante la· Junta Hípica el día 25 de mayo de 1964, expresando en

su escrito de apelación 'que a pesar de que aparentemente no procede esta apelación porque prima facie el castigo impuéstole por el Administrador al querellado apelante es solamente de diez (10) días de suspensión *fundamentalmente si procede* ya que se trata de un castigo impuesto arbitrariamente no habiéndose cometido falta alguna que lo justifique' . . . (Escrito de Apelación del recurrente ante la Junta Hípica del 25 de mayo de 1964 Exh. 3) ; que el día 2 de junio de 1964, la Junta Hípica dictó resolución, a petición del Administrador Hípico, desestimando el recurso de apelación por carecer la Junta de jurisdicción a tenor con lo dispuesto en el Artículo 8 de la Ley Hípica en el sentido de que la Junta Hípica tiene jurisdicción apelativa limitada a los casos de suspensión de un mes o más, y en casos de multas de Cien Dólares ($100.00) o más. (Resolución de la Junta Hípica de 2 de Junio de 1964, Exh. 4) ; que en su resolución de 2 de junio de 1964, la Honorable Junta Hípica manifestó 'alega el apelante que dicha disposición (Artículo 8 de la Ley Hípica) no se aplica toda vez que la resolución del Administrador es caprichosa, arbitraria y contraria a la ley y anticonstitucional' y continúa la Junta a la página 2 de su Resolución 'si el jinete apelante entiende que la determinación hecha por el señor Administrador *le causa daño a su reputación,* él puede recurrir a los remedios que tiene en ley para proteger sus derechos y citó la Honorable Junta el caso de *Hernández* v. *Comisión Hípica,* 50 D.P.R. 100.' "

El recurrente radicó una "acción civil" contra el Administrador Hípico y contra el Jurado Hípico alegando que el demandante tenía un claro e indiscutible derecho constitucional a no ser castigado sin el debido proceso de ley, o sea, sin habérsele notificado cargo alguno, sin haber sido citado a vista, sin haberse traído prueba de clase alguna contra él sobre una posible violación de la Ley Hípica o su reglamento; que dicho castigo, a pesar de que aparecía extinguido ya al momento de notificársele la resolución, subsiste en su expediente y en cualquier momento puede entorpecerse su trabajo profesional en los hipódromos del continente. En dicha acción civil se solicitó del Tribunal los siguientes pronunciamientos: (1) que el demandante recurrente tiene de-

recho a asistencia legal en cualquier comparecencia para responder de cualesquier cargos ante el Jurado hípico, el Administrador Hípico o cualquier otra Autoridad Hípica; (2) que los incisos 20 y 21 del Art. 1001 del Reglamento Hípico en tanto y en cuanto privan al demandante del derecho constitucional a la libertad de palabra son nulos y anticonstitucionales; (3) que ni el Jurado Hípico ni el Administrador, ni ninguna otra Autoridad Hípica tiene facultad para castigar al recurrente sin haber cumplido con los requisitos mínimos de un debido proceso de ley y (4) que el castigo impuesto en esta forma debe ser eliminado del expediente del demandante recurrente en los archivos de la "Administración" Hípica en Puerto Rico y así mismo que si el castigo hubiere sido notificado a cualquier agencia, instrumentalidad o autoridad del extranjero, relacionada con el deporte hípico, se le notifique asimismo la eliminación de dicho castigo. Solicitada la desestimación por los demandados recurrentes, por los fundamentos (1) que la demanda no expone una reclamación que justifique la concesión de un remedio; (2) que habiéndose cumplido el castigo impuesto al demandante la reclamación es académica; (3) que el demandante no ha agotado el remedio administrativo, la ilustrada Sala de San Juan del Tribunal Superior de Puerto Rico dictó la siguiente sentencia:

"Examinada la demanda en la forma mas [sic] favorable al demandante y vistas las disposiciones del artículo 9 de la Ley Hípica de Puerto Rico, Ley número 149 de 22 de julio de 1960, se declara con lugar la moción de desestimación toda vez que el demandante no ha agotado el remedio administrativo. Además, no habiendo el demandante recurrido ante este Tribunal mediante el recurso de certiorari que provee dicho artículo 9, la adjudicación que hizo el Jurado Hípico o el Administrador Hípico en su caso, constituye causa juzgada."

Los artículos que se alega son aplicables a la cuestión litigiosa son los siguientes artículos de la Ley Núm. 149 de

22 de julio de 1960 creando la *Administración* del Deporte
Hípico: Art. 8: Cualquier persona afectada por las órdenes,
decisiones, suspensiones o multas impuestas por el Adminis-
trador Hípico, el Jurado y los Jueces de salida, podrá apelar
ante la Junta Hípica; Disponiéndose, que en caso de pena-
lidades, multas o suspensiones, sólo podrá apelarse cuando
la suspensión fuere por un término de tres meses o más o
la multa impuesta fuere de $100 ó más. Las apelaciones no
suspenderán los efectos de las órdenes, decisiones, suspensio-
nes y multas mientras se resuelve la apelación por la Junta.
En casos de multa la persona castigada no podrá inscribir
ni correr caballos a menos que deposite en la Oficina del
Administrador el importe de la multa, el cual le será devuelto
de serle favorable la resolución de la Junta. Toda apelación
deberá radicarse en la Secretaría de la Junta Hípica dentro
de cinco (5) días a partir de la notificación a la persona
perjudicada. La Junta verá el caso en apelación con audien-
cia de las partes dentro de los quince (15) días de radicada
la apelación y deberá dictar resolución dentro de los quince
(15) días siguientes a la vista. La Junta podrá resolver
sosteniendo, modificando o revocando la orden o decisión ape-
lada. La parte afectada y los funcionarios de la Adminis-
tración tendrán derecho a estar representados por medio
de abogados. La Junta establecerá por Reglamento la forma
en que se conducirán los procedimientos ante ella.

Art. 9: Las decisiones, órdenes o resoluciones finales de
la Junta Hípica, sólo podrán ser revisadas mediante recurso
de *certiorari* por la Sala de San Juan del Tribunal Superior
del Tribunal de Primera Instancia de Puerto Rico en cuanto
a errores de derecho; disponiéndose, que antes de las radi-
caciones de la petición de *certiorari*, deberá solicitarse me-
diante moción al efecto la reconsideración de la decisión,
orden o resolución a la Junta Hípica, la que vendrá obligada
a resolver sobre los méritos de la misma, dentro de un
término no mayor de diez (10) días después de su radica-

ción en la Junta. La petición de *certiorari* provista por esta ley, deberá presentarse dentro del término de quince (15) días de haberse notificado de la decisión, orden o resolución final correspondiente a la parte perjudicada; Disponiéndose, que el recurrente sólo podrá alegar, como errores de derecho en su recurso de revisión, aquéllos que hubiese alegado en su moción de reconsideración a la Junta Hípica. El Tribunal Superior deberá resolver el recurso de *certiorari* provisto por esta ley, dentro de treinta (30) días después de haber sido sometido definitivamente por las partes. La radicación de la moción de reconsideración provista por esta ley, ni la expedición del auto de *certiorari* por el Tribunal Superior suspenderán la efectividad de la decisión, orden, resolución o actuación de la que se pide reconsideración a la Junta o que se recurre a las cortes, excepto en aquellos días en que los castigos envueltos sean por un término de (30) o menos días. No se expedirán órdenes de entredicho, *injunctions*, ni ninguna otra medida restrictiva que impida la ejecución de las órdenes o resoluciones recurridas, sin notificar y oir a la Junta.

Por otro lado el Art. 6 concede a la Junta Hípica, entre las facultades para reglamentar todo lo concerniente al deporte hípico "determinar y establecer mediante Reglamento, las prácticas indeseables y que se prohiben, por entorpecer el mejor desarrollo hípico", y los incisos 20 y 21 del 1001 del Reglamento Hípico establecen como prácticas indeseables (inciso 20) "Conducirse o dirigirse en forma grosera o soez o faltarle el respeto a cualquier funcionario o empleado de la Administración." e (inciso 21) "Hacer manifestaciones falsas o detrimentales al deporte hípico así como a las personas relacionadas con el mismo." Como se recordará las manifestaciones que le hizo el demandante recurrente al periodista fueron: "que se sentía abrumado, perseguido y oprimido y pensaba trasladarse a la ciudad de Nueva York para continuar allí ejerciendo su profesión de jinete ya que aquí

se le hacía imposible", y al recordarle el periodista que el demandante recurrente, como jinete, había sido el jinete con más triunfos en el año 1963 y que durante el año 1964 iba en la delantera con 16 ó 17 victorias, el demandante recurrente contestó "que le regalaba dicho liderato a los señores del Jurado para que hicieran con él lo que mejor les pareciera".

La regla de mayor flexibilidad para juzgar los méritos de una adjudicación administrativa, sobre todo ante una impugnación constitucional, es examinar tanto las disposiciones de la ley como la aplicación que de la misma hacen los funcionarios a cargo de ella para determinar si en virtud de la informalidad del trámite provisto por el estatuto o de la discreción concedida al funcionario se ha lesionado un derecho del peticionario. A veces la lesión de un derecho la provoca el trámite confiscatorio dispuesto por la propia ley y en otras ocasiones, es la disposición de ánimo poco razonable del funcionario llamado a aplicar la ley. Como puede fácilmente concluirse un funcionario dispuesto a aplicar con mesura y discreción las medidas coactivas de un estatuto puede salvar cualesquiera deficiencias de la ley ante el imperativo constitucional. Entendemos que uno de los ideales que debe desarrollar el funcionario público es evitar el descrédito de la ley y hacer evidente su interés en que la ley resulte lo más justiciera para todos. Algunos funcionarios creen que la discreción que le concede la ley es para actuar en la forma más libre posible ante los fines específicos de la ley o la razón superior de la justicia. No hace mucho tuvimos que manifestarnos sobre este exceso, y decir: "La discreción administrativa no es absoluta. Ningún Tribunal estaría dispuesto a convertir la discreción administrativa en un término mágico que permita una arbitrariedad. Discreto es el juicio si además de estar apoyado en la razonabilidad, se encuentra sostenido por una clara noción de justicia en su

sentido llano." *Rodríguez* v. *Srio. de Obras Públicas*, 86
D.P.R. 258 (Belaval) (1962), cita precisa a la pág. 265.

En cuanto a licencias hace tiempo que venimos insis-
tiendo con las Juntas Administrativas sobre su obligación
de estar en perpetua vigilancia para evitar cualquier lesión
al derecho del peticionario debido a la informalidad del trá-
mite o el enervamiento de las exigencias constitucionales tan
adheridas a la Ley administrativa como la sombra al cuerpo.
Cada vez que se piensa en una ley que concede facultad de
actuar a un funcionario debe pensarse además en el cuerpo
de principios inalienables que ordena todo nuestro estado
civil. En el caso de *Hernández* v. *Comisión Hípica*, 50 D.P.R.
100 (Wolf) (1936), cita precisa a la pág. 102, nos expresa-
mos así:

"La ley que regía el hipismo·en Puerto Rico en la época en
que ocurrió este caso, lo era la núm. 11 de 1932 (pág. 195), que
autorizaba a la Comisión Hípica Insular a formular ciertas
reglas y a delegar poder para actuar a un jurado designado por
la Comisión para la supervisión directa de las carreras. Al
amparo de la facultad concedídale por esta ley, la Comisión Hí-
pica formuló la regla 96 para los jurados, el inciso (h) de la cual
lee así:

'(h) Antes de imponer castigo alguno, deberá practicar,
hasta donde sea posible, una investigación de los hechos de-
nunciados, tomando todas las declaraciones bajo juramento y
dando la oportunidad al querellado de ser oído en su defensa.'

Convenimos en que no fue la intención de los redactores de
dicho inciso que se observaran todas las solemnidades de un
juicio. El jurado de un hipódromo no está en condiciones de
celebrar un juicio completo. Estamos muy convencidos de que
se exigían muchas menos formalidades. Creemos que bastaría
que los testigos y el acusado fuesen citados, juramentados y
examinados de manera informal y que se le diera al *jockey* la
oportunidad de llamar a otros testigos, quizá a algunos de los
otros *jockeys* que tomaron parte en la carrera. Sea esto como
fuere, al demandante apelado no se le dio oportunidad para
defenderse. Lo que le sucedió a Hernández fue algo más parecido
a lo que ocurre a la terminación de ciertos juicios criminales,
cuando la corte le pregunta al acusado si tiene alguna razón que

alegar para que no se dicte sentencia. Si procede un *injunction* por dejar de cumplir con las disposiciones de la regla 96 *supra,* éste es un caso que claramente cae bajo la misma."

En el caso de *Las Monjas Racing Corp.* v. *Com. Hípica,* 67 D.P.R. 45 (De Jesús) (1947), cita precisa a las págs. 52–53, volvimos a insistir sobre lo mismo:

"Tratándose de una cancelación o revocación de licencia, ¿actuó la Comisión dentro de la autoridad conferídale por el art. 7 de la Ley Hípica, dispositiva de que 'para cancelar cualquiera de las licencias expedidas por la Comisión Hípica Insular, ésta concederá a la parte una previa audiencia y oportunidad de defenderse'? La Comisión notificó los cargos a la peticionaria y señaló día para la audiencia. Ese día compareció la peticionaria y negó los cargos, pero la Comisión se abstuvo de presentar evidencia alguna para substanciarlos, alegando que por la investigación que había hecho previamente, se había enterado de que las deficiencias no habían sido corregidas.

Ésa no es la audiencia que contempla la ley. En el caso de *Int. Com. Comm.* v. *Louis.* & *Nash. R.R.,* 227 U.S. 88, 93 (1913), se dijo por el Tribunal:

'La Comisión es un cuerpo administrativo y aun cuando actúa en una capacidad cuasi judicial, no está limitada por las reglas estrictas, sobre admisibilidad de evidencia, aplicables en los pleitos entre litigantes privados. *Int. Com. Comm.* v. *Baird,* 194 U.S. 25. Pero cuanto más liberal es la práctica en la admisión de testimonio, tanto más imperativa es la obligación de seguir las reglas fundamentales de evidencia por las cuales se reclaman o defienden derechos. En tales casos los comisionados no pueden actuar basados en su propia información como antiguamente podían hacerlo los jurados. Todas las partes deben ser completamente informadas de la evidencia sometida o que ha de ser considerada, y debe dárseles oportunidad de repreguntar testigos, de examinar documentos y de ofrecer evidencia en explicación o refutación. De ninguna otra manera puede una parte sostener sus derechos o hacer su defensa. De ningún otro modo puede ella poner a prueba la suficiencia de los hechos para sostener la conclusión, porque de lo contrario, aunque apareciese que la orden no estaba basada en evidencia, la manifiesta deficiencia podía ser siempre explicada bajo la teoría de que la comisión tenía ante sí,

extraña y desconocida, pero presuntivamente suficiente información para sostener su conclusión. *United States* v. *Baltimore & Ohio S. W. R. R.*, 226 U.S. 14.'

Sostienen la misma doctrina *Crowell* v. *Benson*, 285 U.S. 22, 48 (1932) y *Moran* v. *School Committee of Littleton*, 59 N.E.2d 279, 281 (Mass. 1945)."

El tercer caso que destacaremos es el caso de *Archilla* v. *Com. Hípica*, 72 D.P.R. 425 (Marrero) (1951), cita precisa a las págs. 430–432:

"De los autos surge que los peticionarios eran dueños de caballos; que tenían inscritos los mismos a su nombre en la Comisión Hípica Insular y que al solicitar la renovación de sus licencias éstas les fueron denegadas sin celebración de vista, sin darles oportunidad para ser oídos, y sin expresarse los motivos en que tal denegatoria se basaba.

Admitimos que en armonía con lo provisto en la ley, la Comisión querellada estaba ampliamente facultada para adoptar reglamentos y que éstos una vez aprobados por el Gobernador tenían fuerza de ley. Asimismo, que en beneficio del deporte la Comisión estaba facultada para denegar la solicitud de cualesquiera licencias relacionadas con el hipismo. Empero, reiteradamente se ha resuelto que cuando por legislación el estado delega en un organismo gubernamental la facultad de otorgar licencias para dedicarse al ejercicio de una profesión, negocio u ocupación que no es inherentemente lesivo al bienestar público, semejante licencia una vez otorgada se convierte en un derecho personal valioso que no puede ser luego revocado o menoscabado en forma alguna, a no ser mediante la debida notificación y la celebración de una vista justa e imparcial ante un tribunal o junta no prejuiciados. En el presente caso, repetimos, a los peticionarios les fueron otorgadas licencias como dueños de caballos. Las mismas, por disposición expresa del artículo 44 del reglamento vencían el día 31 de diciembre de cada año, teniendo en su consecuencia que ser renovadas de año en año en caso de que las personas a cuyo favor fueron otorgadas así lo interesaran. La negativa a renovar sus licencias, bajo las circunstancias reseñadas, equivalía, conforme indicó el tribunal a quo, a la cancelación de las mismas, no pudiendo la Comisión querellada, mediante el requisito de una renovación de año en año lesionar el derecho de los peticionarios a obtenerlas, a menos

que ordenara la celebración de una vista, diera a ellos la oportunidad de ser oídos y concluyese que existían motivos fundados para rehusar expedirlas. Véanse artículo 7 de la Ley 11 de 1932, según figura en la nota 3; *Las Monjas Racing Corporation* v. *Comisión Hípica*, 67 D.P.R. 45, 49; *State* v. *Otterholt*, 15 N.W.2d 529, 531; *Leakey* v. *Georgia Real State Commission*, 55 S.E.2d 818, 819; *State* v. *Swearingen*, 22 N.W.2d 809, 812; XLV Colum. L. Rev. (1945), págs. 67 *et seq;* y Gellhorn, *Administrative Law, Second Edition,* 1947, págs. 275.

No habiéndose dado a los peticionarios la oportunidad de ser oídos, la resolución de la Comisión denegándoles las licencias interesadas resultaron contrarias a derecho. El tribunal inferior, por tanto, actuó acertadamente al dictar sentencia en la forma en que lo hizo."

Sobre la vigilancia del poder judicial en cuanto a la arbitrariedad de la adjudicación administrativa, en el caso de *Debién* v. *Junta de Contabilidad,* 76 D.P.R. 96 (Ortiz) (1954), cita precisa a las págs. 104-105 nos expresamos en los siguientes términos:

"Se trata en este caso de licencias reglamentadas por el Estado. El legislador válidamente ha delegado en una Junta la concesión y denegación de tales licencias y, al igual que otras entidades administrativas, la Junta debe tener amplias facultades discrecionales para aquilatar los hechos y factores relevantes en vista, especialmente, de la experiencia y los conocimientos especializados de los componentes de esas entidades. Generalmente, se puede conceder a una junta administrativa el poder de comprobar y calificar la idoneidad y aptitudes de solicitantes de licencias, al igual que los hechos y condiciones requeridas por el estatuto, y de determinar si las disposiciones de la ley han sido cumplidas, de acuerdo con la significación generalmente aceptada de los términos del estatuto. 33 Am. Jur. 377, 378, 379. El legislador establece las normas generales, tan amplias que puedan dejar al administrador un margen adecuado de libertad para complementar las normas legislativas mediante la aplicación de su juicio experimentado, pudiendo desenvolverse la agencia en un área de análisis, apreciación y discreción administrativa, siempre y cuando que esa discreción tenga una base de razonabilidad. *Secretary of Agriculture* v.

*Central Roig Co.,* 338 U.S. 604, 611; *Gray* v. *Powell,* 314 U.S. 402, 412; *Board* v. *Hearst Publications,* 322 U.S. 111; *Board of Governors* v. *Agnew,* 329 U.S. 441; 58 Harv. L. Rev. 70, *Review of Findings of Administrators, Judges, and Juries: A Comparative Analysis.* Pero el respeto judicial a la relativa libertad de acción de los administradores no puede llegar hasta el extremo de la indiferencia pasiva y la condescendencia total. El 'desideratum' de autonomía administrativa no justifica una independencia absoluta de la intervención judicial. El área de discreción debe tener linderos jurídicos. El territorio de actuación administrativa debe tener fronteras judiciales. La discreción administrativa no es absolutamente ilimitada. La discreción de una junta debe tener una base racional en la prueba. Las decisiones de una junta en cuanto a concesión o denegación de licencias no pueden ser arbitrarias, caprichosas, fraudulentas o desprovistas de base razonable en la prueba. 33 Am. Jur. 379; *McDonough* v. *Goodcell,* 13 Cal.2d 741; *Riley* v. *Chambers,* 181 Cal. 589; *Jaffarian* v. *Murphy,* 183 N.E. 110; *Hazel Park Racing Ass'n* v. *Inglis,* 58 N.W.2d 241; *American Committee on Maternal Welfare* v. *Mangan,* 14 N.Y.S.2d 39, confirmado en 27 N.E.2d 278; *Farrand* v. *State Medical Board,* 85 N.E.2d 113. Prevalece un criterio de razonabilidad en el ejercicio de la discreción administrativa. 62 Harv. L. Rev. 1058, 1059."

Aplicando la regla flexible que permite aunar en una única cuestión de derecho, las disposiciones de la ley con la discreción del administrador que la aplica para suplir cualesquiera deficiencias de la ley, creemos estar frente a un caso en que no es necesario entrar a considerar cualquier estado de inconstitucionalidad del estatuto, porque las deficiencias en la informalidad del trámite pueden ser suplidas por una razonable oportunidad de defensa concedida por la discreción del Administrador o de la Junta Administrativa encargada de la aplicación de la ley. No puede haber texto ni sutileza de intérprete que pueda eliminar la oportunidad de ser oído antes de procederse a la cancelación de una licencia otorgada por el Estado, conferida expresamente por nuestra Constitución.

Debe concedérsele dicha oportunidad al demandante recurrente y permitirle la correspondiente asistencia de abogado para objetar, defender y amparar en la esfera del Derecho Administrativo la facultad para actuar de la "Administración" y al derecho del peticionario a continuar en el disfrute de su derecho de propiedad. Es posible que los incisos 20 y 21 del Art. 1001 del Reglamento aplicado estrictamente a ejercicios razonables de la libertad de palabra y del derecho a formular los agravios correspondientes contra el Estado—en este caso contra los funcionarios de la Administración—pueda crear una lesión constitucional. No obstante necesitaríamos una gama más extensa de los distintos matices que la que nos ofrece los supuestos de la prueba hasta el presente. Si bien la violación del inciso 20 nos parece un razonable ejercicio de la libertad de palabra, no estamos tan seguros en cuanto al segundo. Estamos conformes asimismo que ni el Jurado Hípico, ni el Administrador, ni ninguna otra autoridad hípica tienen facultad para cancelar licencia del demandante recurrente sin cumplir con los requisitos mínimos de un debido proceso de ley y cualquier actuación en ese sentido resulta ilegal y nula. La suspensión impuesta en esa forma debe ser eliminada del expediente del demandante recurrente en los archivos de la Administración.

Este caso le deja a uno cierto malestar en la conciencia, un exceso de restricción tanto al momento de formular una queja como al solicitar un remedio razonable. Estamos completamente advertidos que la "administración" de ciertos derechos individuales no debe hacerse en la forma rígida que creara el exceso de juridicidad y el formulismo procesal del siglo XIX pero tampoco debemos permitir que se diluya todo un sistema de Derecho humano dentro de la magia de la "administración".

Bodenheimer, el famoso autor de una *"Teoría del Derecho"* de grande predicamento entre los estudiosos de nuestras ciencias, ha planteado el problema de la siguiente manera:

"moral, costumbre y Derecho no son los únicos instrumentos de control social en la sociedad política moderna. En el estado moderno hay otro instrumento de regulación social al que se denomina 'Administración'. Su importancia y ámbito están aumentando continuamente . . . Ningún tratado moderno de Ciencia del Derecho puede ser completo si no estudia las relaciones entre Derecho y Administración; hay, sin embargo, pocos campos en donde haya mayor confusión. Esto es particularmente cierto del Derecho administrativo, en el que se enfrentan directamente Derecho y Administración . . . Apenas hay problema que esté tan íntimamente entrelazado con los problemas fundamentales de la Ciencia del Derecho como el problema del Derecho Administrativo . . . El estudio ha de comenzar definiendo el término 'Administración'. La 'Administración' es la regulación de los asuntos públicos o privados, según el principio de utilidad . . . La Administración, en su esencia, es un ejercicio de poder. La administración pública en particular es una esfera de actividad libre del gobierno. La consideración directora de la administración pública es el principio de utilidad y la voluntad de lograr resultados prácticos mediante la aplicación de los medios más eficaces. La Administración pública no limitada por el Derecho es puro imperio del poder. Como ha demostrado ampliamente la experiencia de los modernos Estados totalitarios, un Estado puramente administrativo tiende a borrar la diferencia entre poder y Derecho y hacer así nula y carente de sentido la noción de Derecho. Una nación que deja de percibir la diferencia entre las regulaciones administrativas y jurídicas puede perder fácilmente su libertad y su Derecho, aun sin darse cuenta de ello . . . El Derecho administrativo no se ocupa de la transmisión de la voluntad del Estado en ninguna de sus formas. Se ocupa de los *límites* puestos al ejercicio de esa voluntad. Tampoco se ocupa el Derecho administrativo de la esfera discrecional asignada a los funcionarios administrativos, sino por el contrario, de las *restricciones* puestas a esa discreción. Debe definirse el Derecho administrativo como el Derecho que se refiere a las limitaciones puestas a los poderes de los funcionarios y corporaciones administrativas. Perdería su carácter de rama jurídica si su función consistiera en describir y enumerar los poderes ejecutivos y discrecionales, de que se inviste a los órganos administrativos . . . Frankfurter de la siguiente definición: 'El Derecho administrativo se ocupa del control jurídico ejercido por los

órganos de la administración del Estado, distintos de los tribunales y del control ejercido por los tribunales sobre tales órganos.' Estas definiciones ponen de manifiesto elementos importantes del Derecho administrativo. Esta rama del Derecho tiene como misión salvaguardar los derechos de los individuos y grupos frente a invasiones indebidas por parte de los órganos administrativos. Determina y circunscribe la esfera de acción dentro de la cual deben operar los órganos administrativos; indica también los remedios que quedan abiertos a los ciudadanos en el caso de que el órgano administrativo trascienda su esfera de acción: el control ejercido por los tribunales de justicia sobre los órganos administrativos está destinado, sobre todo, a impedir, prevenir o remediar cualquier violación de los derechos individuales por actos administrativos. La delimitación de esta área de control es, por tanto, una de las funciones más esenciales del Derecho administrativo. Puede suscitarse el argumento de que frecuentemente una ley o norma jurídica no limita el poder de los funcionarios ejecutivos, sino que, por el contrario, les concede y atribuye determinar los poderes. ¿Pierde la calidad de acto jurídico una ley que contiene una concesión de poderes administrativos, pero no expresa ninguna limitación al ejercicio de tales poderes? Sería absurdo examinar toda ley o disposición jurídica con objeto de determinar si contiene una *concesión* o una *limitación* de poderes y únicamente en este último caso honrarla con el atributo de 'acto jurídico.' Para determinar si un sistema político es un 'imperio de la ley' es necesario considerar el orden jurídico como un todo. Hay que determinar si el poder del gobierno está limitado, y hasta qué punto lo está y qué salvaguardias existen contra los actos arbitrarios de los funcionarios públicos. Hay que averiguar qué restricciones a la actividad del gobierno establecen las normas generales del Derecho o las leyes promulgadas. Si se amplía mucho la esfera de actividad libre y sin restricciones del gobierno y se eliminan o restringen en gran medida los remedios de que disponen los individuos o grupos contra la invasión de sus esferas privadas, el Derecho camina hacia su abdicación . . . Lo que importa principalmente al Derecho son los derechos; a la Administración los resultados; el Derecho conduce a la libertad y la seguridad en tanto que la Administración fomenta la eficacia y rapidez de la decisión. Los peligros del Derecho son la rígidez y el estancamiento; los de la administración la burocracia y la autocracia . . . Han ido sur-

giendo en rápida sucesión un gran número de órganos administrativos. Hay una tendencia a eliminar o reducir el control judicial de la acción administrativa. La baja estima en que se ha tenido al poder administrativo en el siglo pasado, ha cedido el paso—en muchos sectores—a una exagerada alabanza de sus ventajas. No siempre se percibe con claridad que aunque ese poder aparezca en forma de discreción administrativa, sigue siendo poder y, a menos que tenga el contrapeso de las restricciones legales, es susceptible de que se abuse de él. El ejemplo de los Estados totalitarios demuestra amplia y claramente que en un Estado puramente administrativo se da muy poca consideración a la dignidad y los derechos humanos de la personalidad humana." Vide: Edgar Bodenheimer—*Teoría del Derecho* págs. 113–123 (Ed. del Fondo de Cultura Económica de 1942).

La sentencia dictada por la Sala de San Juan, del Tribunal Superior de Puerto Rico con fecha 31 de julio de 1964, debe ser revocada y el caso devuelto para que continúen en dicho Tribunal los procedimientos adecuados para la vista en sus méritos del presente caso.